IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF             ) | |
| THE EXTRADITION OF           ) | No. 24-mj-01365-DLC |
| T.C.                         ) | |

### AFFIDAVIT IN SUPPORT OF MOTION FOR RELEASE FROM DETENTION WITH CONDITIONS PENDING EXTRADITION PROCEEDINGS

I, Victoria Kelleher, do hereby state the following is true based on my knowledge and belief:

1. I am assigned counsel for the juvenile T.C.

2. After T.C.'s first court appearance on June 18, 2024, T.C. was transported to Manson Youth Institution ("Manson") for detention in Cheshire Connecticut, a state detention facility.

3. I have visited several Massachusetts Department of Youth Services ("Mass DYS") detention facilities, including most recently on June 20, 2024 when I visited the Northeast Youth Services Center , a hardware secure Mass DYS facility located in Essex County.

4. On June 20, 2024 I spoke with Cecely Reardon, the Commissioner  of Department of Youth Services for the State of Massachusetts. The phone call was related to my grave concerns about the Manson facility and treatment of T.C., and to determine whether Manson's conditions and practices were consistent with humane and lawful practices for children. I have also reviewed the policies of Mass DYS available online.

5. My concerns about Manson were based on my observations. I visited T.C. at Manson on June 16, 2024, two days after his first appearance. On June 15, 2024, I called Manson several times throughout the day to speak with staff and no one answered the phone the entire day.

6. From my home Manson is approximately a 3 hour drive one way, and with stops took me 3 1/2 hours of one-way travel. Total travel time alone was 7 hours round trip.

7. Upon entry at Manson, I was greeted by a prison guard in uniform, and throughout my visit saw only prison guards working in the facility overseeing the children

   detained there. I never once observed uniformed prison guards working at Mass DYS facilities, even in their high-level secure facilities.

8. All the children detained at Manson wore prison clothes, similar to what I have observed at adult prisons in Massachusetts. I never once observed children in prison garb in Mass DYS facilities.

9. I met with T.C. in a small room within the Manson visitors area. The visitors area generally had cubicles where seats were separated with glass for non-contact visits, similar to what I have witnessed in adult prisons in Massachusetts. I never observed rooms full of cubicles for non-contact visits at Mass DYS facilities.

10. T.C. was brought into the attorney room by a prison guard. His appearance was concerning. The majority of hIs face was red and chafed, and his lips were peeling. He explained that he normally took prescribed medication that caused a skin condition if not properly treated with moisturizing cream. Although he asked for some medical help with his condition, he was not provided with any medical assistance. Rather he was told to drink water.

11. T.C. described his detention conditions at Manson. Upon arrival he was placed in total isolation in the medical unit. The room consisted of a bed in the middle of the room without a pillow. The lights were kept on 24 hours a day. The room was bare and had no personal or reading materials. The rules permitted only one phone call per 8 hour shift, even to his attorney, although one of the officers permitted him to make additional calls. He was not brought to a unit because they had no staffing over the weekend to conduct screening.

12. Throughout the visit, T.C. was visibly distressed and emotionally distraught as a result of the isolation he experienced at Manson.

13. As a result of concerns raised by my visit to Manson, I conducted research on Manson and discovered reports from 2020 and 2021 in which the state and federal government determined that Manson violated the civil rights of children in its custody by using punitive and unnecessary lengthy periods of isolation, depriving the children of education, and other violations of law.  My research did not reveal any evidence that Manson had cured these violations.

14. I have also determined from my, review of a website related to Connecticut's Juvenile Justice Advisory Panel, a panel required for federal funding under the Juvenile Justice and Delinquency Prevention Act of 1974 (the Act), most recently reauthorized in 2018, to ensure compliance with the core protections of the Act, suggests that the group disbanded in 2017 and has not met since.[1] The Act establishes minimum standards for the treatment of justice involved youth.

15. Commissioner Reardon explained that at Mass DYS facilities, which maintains best practices for the detention of juveniles, there are no prison guards. Rather, they employ Juvenile Justice Youth Development Specialists who receive specialized

---

[1] https://portal.ct.gov/opm/cj-jjyd/main-navigation/jjac-agendas-and-minutes. See also, https://ojjdp.ojp.gov/funding/awards/15pjdp-23-gg-06082-mumu (describing its participation in the federal funding program prior to 2017 and its intent to participate again presently.)

training in working with adolescents and providing trauma informed care, and who dress in street clothes at the facilities. The children are never in prison garb but rather provided with polo shirts and loose-fitting pants for comfort.

16. Commissioner Reardon explained that when children arrive at their facility, they are provided with their prescribed medication if they have been regularly taking their medicine and do not have it with them.

17. Commissioner Reardon explained that upon entry to a Mass DYS facility, each child is given psychological screening, and that such counselors are available for screening over the weekend. A child is then placed in a room on a unit that same day.

18. Massachusetts changed its policies to eliminate punitive room confinement in 2014. Per policy, youth may only be kept involuntarily in their room outside of sleeping hours for the following reasons: to calm a youth who is exhibiting seriously disruptive or dangerous behavior; for population management; for the safety and security of a youth; and for investigation of an incident. Most instances of room confinement last a matter of minutes. Even when segregated in their room, they usually have access to their personal belongings and are able to read or otherwise engage in personal activities. In no case would a youth deemed at any risk of self-harm or awaiting clinical assessment be isolated in their room; rather their door would remain open, including during sleeping hours and a staff member would be posted at the door.

19. Based on the conditions observed at Manson, research regarding Manson's lack open compliance with basic civil rights and federal funding requirements for more than five recent years, and the specific treatment of T.C. — including the use of isolation for almost three consecutive days and the lack of medical treatment — it's undersigned counsel's firm belief that Manson is a completely inadequate and unsuitable place to detain children, and continues to violate their civil rights.

    Signed under the pains and
    penalties of perjury

    /s/ Victoria Kelleher

    Victoria Kelleher
    Kelleher & Maceo, P.C.
    BBO #637908
    53 State Street
    Suite 500
    Boston MA 02109
    978-744-4126

CERTIFICATE OF SERVICE

      I hereby certify that a true copy of this document was served on all counsel of record this day, June 20, 2024, and with the United States District Court, District of Massachusetts, 1 Courthouse Way, Boston, 02210.

      <u>/s/ Victoria Kelleher</u>

      Victoria Kelleher