IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | No. 24-mj-01365-DLC |
| T.C. | ) | |

### SECOND EMERGENCY MOTION TO RECONSIDER ORDER DENYING RELEASE DUE TO SERIOUS ASSAULT ON THE JUVENILE IN THE CUSTODY OF NEWARK NJ AND REFUSAL BY MANSON TO TAKE CUSTODY

Now comes T.C., a Juvenile with no prior criminal history who is an American citizen, who moves this Honorable Court for an Emergency Order to release him to the custody of his aunt and uncle. As reason therefore, the Northeast Detention Center in Newark, New Jersey ("Newark") is unable and unwilling to protect him from serious assaults by other juveniles in its facility, and Manson Youth Institute of Connecticut ("Manson") refuses to accept T.C. in their custody because of the liability associated with Manson's own wrongdoing in this case. As such, these factors constitute a change in circumstances that demonstrate the government's unwillingness to utilize a suitable facility to detain T.C., demonstrate a change of circumstance constituting "special circumstances" as required for the release of an extradite, and warrant T.C.'s release from detention to his aunt and uncle's care forthwith.

As further reason therefore, the Juvenile states the following:

1. On Friday, July 12, 2024, the Marshals transferred T.C. from Manson to Newark. On July 15, 2024, T.C. filed an emergency motion for an order to transfer to Massachusetts Department of Youth Services ("Mass DYS") or, in the alternative,

for T.C.'s release from detention ("First Emergency Motion".) Among the reasons cited by T.C. in his First Emergency Motion were: (a) that he was told by a prison guard that when he left the protective care unit and entered general population he would be assaulted; (b) that Newark was so far away from his supports, including his family and attorneys, that access to his supports was severely diminished; (c) that telephone access was seriously limited, increasing his isolation from supports;[1] (d) that T.C. was confused, depressed, and afraid for his safety; and (e) that the move to Newark by the Marshals under these circumstances amounted to cruel and unusual punishment.

2. T.C. also noted in his First Emergency Motion that Newark was "much worse" than Manson — despite that Manson had violated his rights as a juvenile in ways detailed in prior submissions

3. On July 16, 2024, the Court denied T.C.'s First Emergency Motion, but gave T.C. the option of returning to Manson.

4. In response, T.C. filed notice with the Court on July 17, 2024 that he would prefer to be returned to Manson.

---

[1] In fact, T.C. has been completely unable to make direct calls to his father in Turkey since he entered the population because the facility cannot facilitate overseas calls from the population phones. All calls to T.C.'s father have required that T.C. first call his attorney, and then his attorney add T.C.'s father to the call. This requires that T.C.'s counsel not only be available to take the call, but also that counsel remain on the line for these calls. Such a procedure violates T.C.'s right as a juvenile to maintain contact with his family. *See e.g., Stanley v. Illinois,* 405 U.S. 645, 651, (1972) (no question that the "integrity of the family unit has found protection in the Due Process Clause…"); *Moore v. City of E. Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (opinion of Powell, J.) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.").

5. On July 18, 2024, undersigned counsel Victoria Kelleher ("undersigned counsel") contacted the government to determine when the Marshals would return T.C. to Manson. The government related that the Marshals reported T.C. would not be returned to Manson because Manson was refusing to accept him. Specifically, it was related that they didn't want the "problems" associated with their publication of T.C.'s personal information. Moreover, the government also related that it just learned that T.C. was transferred from Manson to Newark initially in part because of Manson's own concerns about their violation of T.C.'s privacy rather than to improve T.C.s conditions of confinement.

6. Also on July 18, 2024, undersigned counsel learned that T.C. was assaulted and beaten by three juveniles on the unit where he was placed in general population after leaving protective custody. Specifically, the three perpetrators jumped T.C. from behind as he was walking away from the telephone, and then punched T.C. in the face and beat him about the head. T.C. was taken to the hospital and received stitches to his lip. He also has abrasions and loose teeth. The assault was completely unprovoked T.C. was apparently assaulted because someone else wanted to use the phone when it was T.C.'s turn.

7. Because there are no available beds in the medical unit for T.C. at Newark, he has been placed in the quarantine/orientation unit, where new juveniles are placed upon entry.

8. The protective custody unit in Newark is no longer a safe place for T.C. Specifically, it was in the protective custody unit that T.C. was told by a corrections officer that he would be assaulted after he left the protective custody unit. This

information was conveyed to T.C.'s aunt, and after the assault on T.C. she informed one of the sergeants at Newark that the assault had been predicted by the prison guard in protective custody. While undersigned counsel was on the phone with T.C. subsequent to the assault, T.C. was approached by prison staff who questioned T.C. about the identity of the guard that told T.C. he would be assaulted. T.C. reluctantly divulged this information. Undersigned counsel is now concerned about T.C.'s safety in the protective care unit, where he will be under the scrutiny of this same guard — someone who told T.C. about a known danger rather than taking measures to ensure his safety. As such, there is no safe, appropriate unit for T.C. at Newark, a facility that houses pretrial detainees who were denied bail because of their serious criminal history and/or dangerousness, with juveniles who on information and belief have already been convicted for intentional acts of violence and who counsel have been informed are awaiting sentencing or designation.

9. In the Court's Order denying T.C.'s First Emergency Order, the Court ruled:

> As to reconsideration, T.C. fails to present factual circumstances that seriously warrant reconsideration of the motion for release. To that end, the July 9 Order denying release from Manson explained that "the court would be prepared to revisit" the existence of special circumstances "should conditions going forward raise true, substantive concerns akin to some of those raised here or new (equally substantive) concerns based on changed conditions at whatever facility T.C. is being held." (D. 59, pp. 27-28).

9. The conditions faced by T.C., whereby T.C. is detained in poorly resourced facilities outside of Massachusetts that (a) violate T.C.'s right as a juvenile to privacy in the face of an international media frenzy (b) refuse to keep him safe from serious physical assault and (c) keep him in facilities far from his only US- based

family constitute substantive concerns based on changed conditions and warrant his immediate release to prevent to further serious and irremediable harm.

10. As T.C. has endured significant violations of his rights, including lack of protection from serious physical assault, counsel for T.C. implores the Court to reconsider its decision denying his release to the care of his aunt and uncle in Massachusetts with whatever additional conditions the Court sees fit.

11. While the Court previously believed that T.C. had little relationship with his aunt and uncle, T.C. has in fact had a close relationship with them throughout his life, and visited with them often between the time his mother most recently brought him to the Boston area and the time of his arrest on the extradition warrant, including assistance with his medical care and education. This information is included in Exhibit B, attached to T.C.'s First Emergency Motion, and can be supplemented by way of affidavit or oral testimony. In addition to remaining with his aunt and uncle, T.C.'s family would pay for whatever oversight the Court deemed necessary to ensure T.C. remain in Massachusetts throughout the pendency of the extradition proceedings.

12. The government argues that T.C. is not entitled to be placed near his family or counsel, and relies on cases that apply to adults. *See e.g.*, Dkt. 68 at 3. However, T.C. is a juvenile and as such is afforded special protections mandated for juveniles in every state court, as well as federal court. Such protections are deemed necessary for their physical safety and mental health. The government's argument that children do not need to be placed near their family or counsel is without merit and fails to consider the special interests and protections afforded to juveniles more

generally. *See e.g.,* 18 U.S.C § 5035 (prioritizing detention "in or near [a juvenile's] home community."); Justice Manual §9-8.010 ("the law requires that every juvenile in custody be provided with adequate food, heat, light, sanitary facilities, bedding, clothing, recreation, education and medical care, including necessary psychiatric, psychological, or other care and treatment. When a juvenile is arrested or the United States will seek pretrial detention, the local U.S. Marshal is responsible for determining the availability of local juvenile bed space."); 18 U.S.C. § 5035 (accused juveniles to be detained apart from "adult persons convicted of a crime or awaiting trial on criminal charges…" and "adjudicated delinquents…")

13. Just as the Court is concerned about the United States' obligations to Turkey, the government has obligations to ensure the safety of the juvenile in its care and custody based on Turkey's petition for extradition. *See Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions."); *Ingraham v. Wright*, 430 U.S. 651 (1977) ("Among the historic liberties so protected was a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security.").

14. T.C. is a 17 year old United States citizen, is an excellent student, has no criminal record, has not been convicted of any crime, and is not alleged to have committed the crimes in Turkey with criminal intent. Had T.C.'s mother not made the decision to bring him to the United States, T.C. would undoubtedly have remained out of custody awaiting resolution of the case in Turkey. *See* Article 37(b)

of the United Nation Convention on the Rights of the Child, of which Turkey is a signatory ("The arrest, detention or imprisonment of a child shall be in conformity with the law and shall be used only as a measure of last resort and for the shortest appropriate period of time.")[2] Had T.C. committed the crime in Massachusetts, he would undoubtedly have been released to the care and custody of his family awaiting resolution of the case in the United States. *See, Commonwealth v. Humberto H.*, 466 Mass. 562, 576 (2013), quoting *Commonwealth v. Magnus M.*, 461 Mass. 459, 461 (2012)(The application of the bail statute to juveniles must be done through the lens of c. 119, § 53 which mandates that juveniles "as far as practicable . . . shall be treated, not as criminals, but as children in need of aid, encouragement and guidance." In Massachusetts, the courts "recognize that the juvenile justice system 'is primarily rehabilitative, cognizant of the inherent differences between juvenile and adult offenders, and geared toward the correction and redemption to society of delinquent children.'" ) Acknowledging the neuroscience that supports the difference between children and adults, the United States Supreme Court has held that in certain legal applications, age and its attendant characteristics, must be taken into account. See *Roper v. Simmons*, 543 U.S. 551 (2005). One fundamental distinction is that adolescents are in the development process. As the Court noted more than thirty years ago: "Youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Id.*, at 570, quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982).

---

[2] https://www.mfa.gov.tr/convention-on-the-rights-of-the-child.en.mfa.

15. Based on all the foregoing, the defense moves this Honorable Court order that T.C. should be released to the care of his aunt and uncle in Massachusetts forthwith, for all the reasons described in prior pleadings, including but not limited to the government's inability to provide T.C. with a suitable place of detention, imperiling his physical safety and mental health. *See Hu Yau-Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981); *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996); *Hilton v. Kerry*, 754 F.3d 79, 82 (1st Cir. 2014). The Juvenile further asserts that current conditions of confinement amount to a violation of his Fifth, Sixth and Eighth Amendment rights under the United States Constitution.

16. T.C. requests that this Honorable Court address whether there are conditions of release that can abate any perceived risk of flight – an issue deferred in its first Order denying release, Dkt 59 at 18.

### **ALTERNATIVELY, THIS HONORABLE COURT SHOULD ORDER T.C. TO BE TRANSFERRED TO MASSACHUSETTS DYS**

17. The Court previously declined to order the Marshals to detain T.C. in Massachusetts where T.C. is being prosecuted, the most natural place for T.C. to be detained. The sole stated reason for the Marshals decision is their unwillingness to pay Mass. DYS, a well-resourced facility that provides juveniles with appropriate services in a safe and secure environment. Although the Marshals retain authority to determine placement, the Court retains authority to order placement to a proper facility in Massachusetts and should exercise its authority under the emergency circumstances in this case. *See* 18 U.S.C. § 3184 (court "shall issue his warrant for the commitment of the person so charged to **the proper jail**, there to remain until such surrender shall be made") (emphasis added).

18. Undersigned counsel again contacted Commissioner Reardon of Mass. DYS on July 18, 2024 to determine the current availability for placement, the cost of placement, and what attempts the Marshals made to assess costs for T.C.'s detention in Mass DYS before determining that the United States Government couldn't afford to place T.C. in Mass. DYS custody. Commissioner Reardon reported that she recently spoke with Mass DYS General Counsel and the Chief Financial Officer, and neither of them had heard from the Marshals over the course of the last two years. She also reported that they presently have limited bed space, and although they could place T.C. in Mass DYS custody presently, she couldn't guarantee bed space next week.

19. For these reasons, if this Honorable Court does not release T.C. to the custody of his aunt and uncle, the undersigned respectfully requests this Honorable Court to use its authority under 18 U.S.C. § 3184 to place T.C. at a Massachusetts DYS facility.

Respectfully Submitted,

T.C., a Juvenile
By his attorneys,

/s/ Victoria Kelleher

Victoria Kelleher
Kelleher & Maceo, P.C.
BBO #637908
53 State Street
Suite 500
Boston MA 02109
978-744-4126

/s/ Martin G. Weinberg
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza
Suite 1000
Boston, MA 02116
(617) 227-3700

CERTIFICATE OF SERVICE

I hereby certify that a true copy of this document was served on all counsel of record this day, July 19, 2024, and with the United States District Court, District of Massachusetts, 1 Courthouse Way, Boston, 02210.

/s/ Victoria Kelleher

Victoria Kelleher