IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF ) | |
| THE EXTRADITION OF ) | No. 24-mj-01365-DLC |
| T.C. ) | |

**GOVERNMENT'S RESPONSE TO SECOND
EMERGENCY MOTION TO RECONSIDER ORDER DENYING RELEASE**

The United States of America hereby responds to the second emergency motion of T.C. to reconsider the order denying his release, Dkt. 74.

### RELEVANT BACKGROUND

On June 14, 2024, T.C. was arrested pursuant to a complaint for extradition arising from his alleged killing of one person and injuring of four others when he was driving without a license at an excessively high rate of speed and crashed into the victims late at night on March 1, 2024.  T.C. was initially detained at the Manson Youth Institution in Cheshire, Connecticut, the closest juvenile detention facility with available space with which the United States Marshals Service ("USMS") had a contract.[1]  However, due largely to allegations T.C. made about conditions at Manson in repeated filings, *see, e.g.*, Dkt. 22, 26, 29, 40, 50, officials at Manson requested the USMS transfer T.C. to another facility.  The next closest facility with which the USMS had a contract was the Essex County Juvenile Detention Center in Newark, New Jersey.  The USMS transported T.C. from Manson to Newark on July 12, 2024.

The Newark facility houses juveniles between the ages of 9 and 21.  According to the warden of the Newark facility (as conveyed to the undersigned via the USMS), under New

---

[1] The USMS also inquired about housing T.C. at the Long Creek Youth Development Center in South Portland, Maine, but were informed the Maine facility would agree to house T.C. for no more than ten days.

Jersey law, individuals charged as juveniles stay in juvenile custody until the case is closed. Thus, an individual arrested at 17 years old would be detained at the Newark facility until his sentencing, even if he turned 20 or 21 before his sentencing. This appears to be similar to the Massachusetts Department of Youth Services ("MA DYS") system, which according to its website, serves youth ages 12 to 21. *See* https://www.mass.gov/orgs/department-of-youth-services (last accessed July 23, 2024). The warden further conveyed to the USMS that the Newark facility does not have a protective custody unit.

The Newark facility utilizes Zoom to facilitate attorney meetings, in addition to in-person attorney visits. Both can be scheduled for weekends (in addition to during the week) through T.C.'s assigned social worker. Additionally, the government has provided T.C.'s counsel with the contact information for the Social Worker Supervisor at the Newark facility.[2]

On July 18, 2024, while detained in Housing Unit 8 at the Newark facility, T.C. was assaulted by three fellow detainees. The assault was quickly stopped. Medical staff at the facility examined T.C. and additional staff transported him to a local emergency room where he received stitches to his upper lip area.[3] Immediately following the incident, staff at the facility interviewed all the residents of Housing Unit 8. The residents reported that T.C. kept getting into arguments with the other residents about being on the phone too long, which led to the

---

[2] In his motion, T.C. notes that because the Newark facility does not have international calling capability, all calls to his father must be routed through T.C.'s attorney. Dkt. 74 at 2 n.1. It is not clear why T.C.'s calls to his father cannot also be routed through his family in Massachusetts so that his counsel is not required to be available for the calls. Additionally, the government is inquiring if the Newark facility can utilize Zoom for calls with T.C.'s father.

[3] While the Newark facility has medical staff available 24/7, they generally send detainees to a local emergency room as a precaution since they are juveniles.

incident on July 18.[4]  The three inmates suspected of assaulting T.C. have been removed from Housing Unit 8.  T.C. was placed under medical observation upon his return from the emergency room, to be transferred to a different unit once he was medically cleared.

While the USMS does not have a standing contract with MA DYS, they have entered one-time contracts in the past, most recently in 2018.  Upon learning that T.C. may be arrested in Massachusetts, a Deputy U.S. Marshal ("Deputy") called MA DYS to inquire whether MA DYS had available space and whether it was possible to enter a one-time contract for T.C.  The Deputy called the MA DYS Metro Regional Office in Dorchester at the 617-740-0100 phone number posted on the state's website.[5]  The Deputy contacted this office because this was the location that had last taken custody of a USMS detainee in 2018.  The Deputy contacted that number multiple times, but each time he was transferred to different individuals for whom he left voicemails.  However, despite multiple calls and voicemails, the Deputy never received a call back from MA DYS.  As of 2018, MA DYS charged the USMS nearly $400 per day to house a detainee.  In contrast, the Newark facility charges approximately $120 per day.  The USMS estimates it will cost approximately $25,000 more to house T.C. at MA DYS through his extradition hearing in October than at the Newark facility.

## ARGUMENT

The government continues to take no position on T.C.'s motion to the extent he requests to transfer to MA DYS.  The government defers to the Court and the USMS in determining where to detain T.C. pending his extradition hearing. 18 U.S.C. § 3184 (court "shall issue his

---

[4] In a telephone call on July 19, 2024, counsel for T.C. relayed to the undersigned AUSA that T.C.'s housing unit had three phones for the twelve residents of the unit.

[5] *See* https://www.mass.gov/locations/dys-metro-regional-office.

3

warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"). *But see* 18 U.S.C. § 4086 ("United States marshals shall provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution.").

Notably, a transfer to MA DYS obviates the need for the Court to reconsider its detention order. Given the cost factors involved in housing T.C. at MA DYS as well as T.C.'s concerns with the Newark facility, the government offered to expedite T.C.'s briefing schedule and extradition hearing to shorten his time in custody before this court issues a decision on certification of extradition.[6] However, T.C.'s counsel responded that moving up the schedule was "not possible," in part because of the time needed to receive documents and translations from Turkey.[7]

T.C. raises only one new circumstance that he argues warrants release—the incident on July 18.[8] However, staff at the Newark facility responded immediately, provided T.C. with

---

[6] While one of T.C.'s attorneys had trial and travel conflicts, the government understood his other attorney to be available in July and August.

[7] It is unclear what documents and translations T.C. may be seeking from Turkey, particularly given that a fugitive's right to present evidence in an extradition proceeding is severely constrained. *E.g.*, *Charlton v. Kelly*, 229 U.S. 447, 457-58 (1913); *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) ("Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded.") (citations omitted); *Shapiro v. Ferrandina*, 478 F.2d 894, 901, 905 (2d Cir. 1973) ("evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing . . . . statements [that] would in no way explain . . . or . . . obliterate the government's evidence, but would only pose a conflict of credibility . . . should properly await trial in [the requesting country]") (internal quotation marks omitted).

[8] T.C.'s motion also identifies privacy concerns and the distance from his family and lawyers, Dkt. 74 ¶ 9, but the Court previously addressed these circumstances in prior orders denying release. *See* Dkt. 59 at 23-26; Dkt. 71.

medical care, and took steps to permanently separate T.C. from the three other detainees involved in the incident. T.C. has presented no evidence that such an incident is likely to reoccur, or more generally that the level of fighting at the Newark facility is above normal or that the staff are deliberately indifferent to the risk of fighting. *See Hughes v. Judd*, 108 F. Sup. 3d 1167, 1242-43 (M.D. Fla. 2015) (rejecting juveniles' claim that frequency of fighting—two fights per week—at pretrial detention facility was unconstitutional). Accordingly, T.C.'s motion should be denied to the extent he seeks release based on the July 18 incident.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: */s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant U.S. Attorney

Date: July 23, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant U.S. Attorney